IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
No. 3:24-cv-1047

| | | |
|---|---|---|
| CHRISTINE PIROTIN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CIVIL COMPLAINT AND |
| | ) | JURY DEMAND |
| THE UNIVERSITY OF NORTH | ) | |
| CAROLINA AT CHARLOTTE | ) | |
| Defendants. | ) | |
| _____ | ) | |

## COMPLAINT FOR EMPLOYMENT DISCRIMINATION

Plaintiff, Christine Pirotin ("Pirotin" or "Plaintiff"), by and through her undersigned attorney with HKM Employment Attorneys, LLP, files this Civil Complaint and Jury Demand ("Complaint") against Defendant, The University of North Carolina at Charlotte (hereinafter "UNC Charlotte" or "Defendant") and in support, sets forth the following allegations and causes of action:

## PRELIMINARY STATEMENT

1.      Plaintiff Pirotin brings this action to correct unlawful discrimination by Defendant UNC Charlotte under Title VII of the Civil Rights Act of 1964, 42 U.S.C.A. § 2000e-2(a), the Americans with Disabilities Act of 1990 ("ADA"), and 42 U.S.C. §12101 *et seq*. Ms. Pirotin, the former Health and Safety Coordinator at UNC Charlotte, alleges that Defendant terminated her employment because of her

ADA-qualifying impairments, she sought accommodations for those impairments, she filed a disability discrimination complaint, and she complained and filed a Title IX complaint against her director after he engaged in sexually harassing behavior. Ms. Pirotin seeks economic damages, including back pay and lost benefits; non-economic compensatory damages; and attorneys' fees and costs of litigation.

## PARTIES

2.      At all times material hereto, Plaintiff, Christine Pirotin was at all pertinent times relevant to this Complaint a citizen of the United States and a resident of Gaston County, North Carolina.

3.      Plaintiff currently lives in Georgia.

4.      The Defendant, UNC Charlotte, is a branch of the University of North Carolina, an agency of the State of North Carolina and the State's institute of higher education, with a business address of 9201 University City Boulevard, Charlotte, Mecklenburg County, North Carolina 28203-0001.

5.      Plaintiff was, until or about February 15, 2024, employed by Defendant.

## JURISDICTION & VENUE

6.      The Court has original jurisdiction over Plaintiff's federal claims pursuant to 28 U.S.C. § 1343(a) (4) (civil rights action), 28 U.S.C. §1331 (federal question).

2

7.     Pursuant to 28 U.S.C. §1391(b)(1), the Western District of North Carolina is the proper venue for the filing and prosecution of this action, in that the Defendant in this case has a principal place of business within the Western District of North Carolina and because the employment practices and other conduct alleged to be unlawful occurred in this District.

## ADMINISTRATIVE REMEDIES HAVE BEEN EXHAUSTED

8.     The Plaintiff has exhausted her administrative remedies by timely filing a Complaint with the United States Equal Employment Opportunity Commission (EEOC), on January 5, 2024.

9.     The Plaintiff received a Dismissal and Notice of Rights from the EEOC on September 5, 2024. *See* Exhibit A.

10.     The Plaintiff has exhausted her administrative remedies by timely filing a second Complaint with the United States Equal Employment Opportunity Commission (EEOC), on May 2, 2024.

11.     The Plaintiff received a Dismissal and Notice of Rights from the EEOC on her second Complaint on September 10, 2024. *See* Exhibit B.

12.     Plaintiff filed the present action within ninety (90) days of receipt of both the Dismissal and Notice of Rights from the EEOC and has met all administrative prerequisites prior to filing this action.

3

## **FACTUAL ALLEGATIONS**

13.     That on or about February 14, 2022, Defendant UNC Charlotte hired the Plaintiff, Christine Pirotin, as a Health and Safety Coordinator in the Environmental Health and Safety Department ("EHS").

14.     Ms. Pirotin was compensated at a salary of approximately $53,065.42 per year plus funding of a state pension retirement plan other benefits, including health insurance coverage.

15.     Ms. Pirotin's direct supervisor was Health and Safety Manager Bruce Crowell ("Crowell").

16.     Around January of 2023, Crowell went out on medical leave of absence and Darius Griffin ("Griffin"), the Director of EHS, became Ms. Pirotin's interim supervisor

17.     Ms. Pirotin suffers from lupus and was diagnosed in 2020.

18.     During her employment by UNC Charlotte, Ms. Pirotin suffered from a series of physical impairments including mobility issues, fatigue, joint pains, flare ups, sun sensitivity, and occasional brain fog.

19.     On or about April 19, 2023, Ms. Pirotin sought a number of health-based accommodations by submitting an Accommodation Request Form to the Human Resources Department ("HR").

4

20.     From the beginning, it was apparent to Ms. Pirotin that Griffin gave preferential treatment to employees who did not have a disability.

21.     For example, when Ms. Pirotin returned to work after she recovered from a lung infection, she requested a vacuum service from the cleaning crew when she noticed her area had not been vacuumed. Griffin berated her for making such requests and told her everybody was going to want vacuum service too.

22.     Ms. Pirotin tried to explain to Griffin she was trying to prevent environmental triggers and/or maintain a sterile environment free from strong exposure to dust, but he responded by stating, "….it's always something with you, Christine. You create chaos by involving other employees in your personal complaint and now two other people want the same service…you disrupt the office with your complaining…."

23.     Griffin also made comments about Ms. Pirotin's inability to control her personal body temperature. When Ms. Pirotin tried to explain that her disability makes it difficult for her to stay warm, Griffin told her, "It sounds like a personal problem."

24.     When Ms. Pirotin was granted a health-based accommodation to adjust her schedule to have an extra remote day, Griffin intentionally selected a day that he knew would cause her the most inconvenience.

5

25. After Griffin scolded Ms. Pirotin for requesting a vacuum service that she felt was necessary to keep her work area clean and healthy, she felt Griffin had begun his campaign of harassment against her for having a disability.

26. After having received such negative comments, including criticisms about her inability to control her personal body temperature from Griffin, she submitted an Accommodation Request Form to the Human Resources Department ("HR").

27. On April 19, 2023, when Ms. Pirotin requested an extra remote day, she specified, "preferably at the end of the work week which will accommodate a period of recess for recovery. Now I have Thursday remote, Friday would be perfect allowing for recovery, and three full days in the office."

28. April Edwards ("Edwards"), the Assistant Employee Relations Manager reviewed and evaluated Ms. Pirotin's request. Edwards approved an anti-fatigue mat for Ms. Pirotin's workstation and granted one additional remote workday but selected Tuesdays after she consulted with Griffin.

29. On April 21, 2023, Ms. Pirotin attended her yearly progress report meeting with Griffin. This meeting took place just two days after she sought a number of health-based accommodations.

30. During her yearly progress report meeting, Griffin told Ms. Pirotin she dressed inappropriately and made comments about her button-down blouse. Griffin

inquired how many buttons she had on her shirt, and how many of her buttons were unbuttoned, before he proceeded to tell her she had three buttons unbuttoned. Griffin also stated her skirts were too high. Ms. Pirotin does not wear skirts during office hours because her job requires running and her wardrobe must allow it. Ms. Pirotin was stunned by the false accusations.

31.    Upon information and belief, Griffin did not make comments about the clothing of male employees in a sexual manner.

32.    Griffin did not make comments about the clothing of employees who did not request medical accommodations.

33.    The yearly progress report meeting left Ms. Pirotin extremely uncomfortable and she felt sexually harassed. Griffin's observation of her blouse weighed heavily on top of his comments about her body temperature and his objection to her requesting vacuum service.

34.    On April 24, 2023, Ms. Pirotin reached out to Scott Deyo ("Deyo"), the University Ombuds to help her address the yearly progress report meeting. Deyo advised her to file a Title XI complaint.

35.    After speaking with Deyo, Ms. Pirotin filed a complaint with the Office of Civil Rights and Title IX ("CRTIX") against Griffin for sexual or interpersonal misconduct.

36.     In her CRTIX report, Ms. Pirotin stated Griffin mocked her for having a disability by "complaining about [her] request for office vacuum services twice a week," made comments about "[her] inability to control [her] personal body temperature," and made comments that she dressed "inappropriately".

37.     In her CRTIX report, Ms. Pirotin also stated "…for the first time in [her] life, [she] felt sexually assaulted, in a tiny office, alone with a ruthless man, who noticed how many buttons were left unbuttoned on [her] blouse."

38.     Ms. Pirotin's CRTIX report notified UNC Charlotte and their agents she felt Griffin was trying to "frighten [her] out of the university" and "Mr. Griffin has made [her] life turmoil with his aggressive, unfounded and harassing actions. [She doesn't] feel comfortable at work with a man who notices the buttons on [her] shirt…There is so much strange behavior from Mr. Griffin that creates a hostile work environment and his attempt to polarize each of us from one another. [She requested] an interview, and [she] will provide documentation. [She has] also reached out to EEOC … in that as this filing, [she felt] uncomfortable with a man who without reason, seeks to destroy [her] career, stalks [her] personal life and may want to express his anger against."

39.     Clearly, Ms. Pirotin notified UNC Charlotte and their agents she had reached out to EEOC as early as April 24, 2023.

40.    On April 27, 2023, three days after the CRTIX complaint was filed, Griffin texted Ms. Pirotin on her personal mobile phone to check in because he was unable to reach her remotely. On the same day, Ms. Pirotin explained to Griffin her personal phone had failed to charge overnight.

41.    For several weeks thereafter, Ms. Pirotin continued to work and heard nothing further from Griffin about being unable to reach her remotely for a couple of hours.

42.    UNC Charlotte has never provided Ms. Pirotin with a work-issued phone.

43.    On April 27, 2023, Ms. Pirotin filed a SHRA grievance and/or an EEO Informal Complaint Intake Form which had overlapping complaints within her CRTIX compliant. The SHRA and CRTIX complaints were jointly investigated by HR.

44.    On May 5, 2023, Griffin continued his relentless intimidation by completing an off-cycle performance evaluation on Ms. Pirotin. After supervising her for just five months, Griffin gave her an overall rating of not meeting expectations.

45.    During the same time as her off-cycle performance evaluation, Ms. Pirotin was nominated by a fellow staff member to receive the "Golden Nugget" award.

46.     A Golden Nugget award is a way to recognize a staff member for all their hard work. As stated on the UNC Charlotte Staff Council webpage, "A Golden Nugget is given to an employee who goes above and beyond the call of duty and represents UNC Charlotte in a manner we can all be proud of."

47.     In total, Ms. Pirotin has received approximately four Golden Nuggets.

48.     On May 17, 2023, approximately 20 days after the actual incident, Griffin gave Ms. Pirotin a written counseling for being unavailable during her remote workday on April 27, 2023. Such an infraction when committed by nondisabled employees, went unpunished.

49.     Ms. Pirotin believed receiving the written counseling approximately 20 days after the incident was in retaliation for engaging in protected activity.

50.     Ms. Pirotin continued to advocate for consecutive days to work remotely as such an accommodation would provide the best period of recess for her disability.

51.     On May 23, 2023, Edwards finally approved her remote workday changing it from Tuesdays to Fridays, as Ms. Pirotin originally requested. The change occurred after she filed her complaint with CRTIX, SHRA, and reached out to EEOC.

52.     On or about May 29, 2023, Ms. Pirotin met with Cindy Edwards to discuss the Title IX investigation.

53.     On June 7, 2023, Griffin persisted in his harassment of Ms. Pirotin by creating impossible tasks for her to perform.

54.     For example, Griffin instructed Ms. Pirotin to gather all the confined spaces on campus to create a plan to visually inspect the confined spaces for missing, damaged, or incorrect signage. Ms. Pirotin spent an entire day trying to locate one document for this project. Griffin was aware there was no such document, but rather than tell her no such document existed, Griffin had her chasing an imaginary document until the Director of Facility Management requested the task be discontinued.

55.     On June 12, 2023, during their one-on-one meeting, Griffin admitted to instructing Ms. Pirotin to utilize technicians on June 7th but blamed her for wasting funds in her effort to complete the task.

56.     On June 19, 2023, although Ms. Pirotin had always been allowed to use the two golf carts, after Ms. Pirotin filed a complaint with CRTIX, SHRA, and reached out to EEOC, Griffin started critiquing her for utilizing the golf carts.

57.     On the same day, Griffin responded with anger when he observed technicians going in and out of Ms. Pirotin's office. His tone was extremely accusatory and implied that she was having sex with technicians at work stating, "[She] is letting technicians from facilities management into her office with the doors closed and I don't know what that's all about!"

11

58.     On June 23, 2023, Ms. Pirotin had technical difficulties connecting to the VPN and she reached out to the IT department. Upon information and belief, Griffin called the IT department afterwards. Ms. Pirotin believed Griffin checked behind her to try to find her in a gotcha moment.

59.     On June 26, 2023, Ms. Pirotin emailed Michelle Reinken ("Reinken"), the Assistant Vice Chancellor of HR.

60.     Reinken was told the one-on-one meetings with Griffin have escalated to the point Ms. Pirotin felt further violated and harassed because Griffin is "insinuating that [she] is having sex with University of North Carolina Charlotte technicians in [her] office during working hours. [She] felt threatened by [Griffin's] behavior as he continues to create a toxic and now menacing work environment. My title IX investigation through HR has not begun and this bullying is continuing untethered." In response, Reinken directed Ms. Pirotin back to Cindy Edwards.

61.     On July 10, 2023, Ms. Pirotin had a one-on-one meeting with Griffin where he continued his accusatory tone and stated she was letting technicians from facilities management into her office with the doors closed and he wanted to know what that was all about.

62.     On July 25, 2023, Griffin instructed Ms. Pirotin to work on Lockout Tagout utilizing documents which were later identified as outdated and incorrect.

Luckily, another technician handed Ms. Pirotin the correct documents for the Lockout Tagout.

63.    On July 28, 2023, Ms. Pirotin reported to Defendant and their agents that "[Griffin] spends his time in trying to undermine, overload me with work that is not productive, constantly criticizing me and blaming me. He assigns work that is not in my scope of responsibility according to his own Team Coordination Procedure by having me review programs which are reflected in his document to be done by the supervisors."

64.    On August 22, 2023, Ms. Pirotin emailed Attorney Jesh Humphrey ("Humphrey), Vice Chancellor for Institutional Integrity and General Counsel, to address her most recent off-cycle performance evaluation and being improperly disciplined for trying to deal with hazardous energy while staying in compliance with OSHA standards.

65.    On August 29, 2023, Ms. Pirotin submitted a second Job Accommodation Medical Certification Form which indicated she was suffering from "stress induced lupus flare ups" and requested reassignment to an environment that does not have the level of stress induced by her present supervisor.

66.    On August 31, 2023, Ms. Pirotin emailed and specifically requested to be reassigned to the Environmental Coordinator position. A position for which she was qualified.

67. On or about September 10, 2023, Edwards concluded her investigation into the August complaints and made findings of no evidence to substantiate the claims. Edwards recommended that "Griffin and Pirotin utilize available university resources to assist with their communication and workplace interactions. Such resources may include working with the University Ombuds Office and Employee Relations."

68. On September 12, 2023, Ms. Pirotin met with Jennifer Walker ("Walker"), the Chief Audit Officer, to further discuss the issues related to the Lockout Tagout programs that were, in part, the reason Ms. Pirotin contacted Attorney Humphrey.

69. On September 28, 2023, Edwards denied Ms. Pirotin's request for reassignment to another position but provided time-off on an as-needed basis for medical appointments related to her disability and stress management treatments.

70. On October 2, 2023, Griffin gave Ms. Pirotin a written counseling for alleged issues related to the Lockout Tagout programs.

71. On October 3, 2023, Ms. Pirotin reached back out to Walker regarding the written counseling; to seek guidance and to offer a solution to the issues related to the Lockout Tagout programs while insulating herself from potential liability.

72. On October 4, 2023, Ms. Pirotin filed another SHRA grievance against Griffin.

73. On October 4, 2023, Ms. Pirotin responded to Attorney Humphrey's email and explained she had not been contacted by HR for her Title IX concerns. She shared with Attorney Humphrey two inquiries from coworkers to the Title IX website have been ignored, informed him none of her witnesses had been interviewed, and expressed concerns that one of her witnesses left.

74. On October 11, 2023, Edwards emailed Ms. Pirotin the notification letter of the findings of the investigation that was brought to the Office of Civil Rights and Employee Relations.

75. In October of 2023, Ms. Pirotin was assigned to work primarily with John Svenson on the issues related to the Lockout Tagout programs.

76. On November 13, 2023, Edwards concluded her investigation into the October 4, 2023, SHRA Grievance and made findings of no evidence to substantiate the claims. Edwards again recommended that "Griffin and Pirotin utilize available university resources to assist with their communication and workplace interactions. Such resources may include working with the University Ombuds Office and Employee Relations."

77. On November 17, 2023, Griffin gave Ms. Pirotin a written counseling for issues related to the Lockout Tagout programs.

78. Although Ms. Pirotin attended the Fall Harvest, Griffin excluded her from the team photo. Ms. Pirotin believes her exclusion was intentional.

79.     Upon information and belief, on or about January 11, 2024, Chancellor Sharon Gaber received a follow-up inquiry from another employee regarding their own Title IX complaint. Upon information and belief this Title IX complaint addressed Ms. Pirotin's unfair treatment at the hands of her director.

80.     In January of 2024, the working conditions to which Ms. Pirotin was subjected to became so intolerable, and having received no help from the Office of Civil Rights and Employee Relations, Ms. Pirotin reached out to the University Ombuds Office and Employee Relations for communication and workplace interaction assistance with her director.

81.     On January 22, 2024, Griffin and Ms. Pirotin had a meeting together through the Ombuds office where Ombudsman Deyo noted some progress was being made.

82.     On January 23, 2024, Ms. Pirotin received an email from Ombudsman Deyo informing her she could no longer continue informal discussions through the University Ombuds office because she initiated a charge with EEOC.

83.     Upon information and belief, on or about January 23, 2024, unbeknownst to Ms. Pirotin, Griffin had made another false accusation against her during the Fire Marshal Life Safety team meeting.

84.     On January 29, 2024, Ms. Pirotin had a one-on-one meeting with Griffin where he alleged, she had a threating tone.

85.     On February 1, 2024, Griffin submitted a recommendation for Ms. Pirotin's dismissal based on his January 29th one-on-one meeting with her.

86.     On February 6, 2024, Ms. Pirotin witnessed Griffin verbally assault and harass a colleague during a safety training at work.

87.     On February 7, 2024, Iris Driver ("Driver"), an Employee Relations Consultant reached out to Ms. Pirotin because she was named a party or a witness to Griffin's berating on the previous day.

88.     On February 8, 2024, Ms. Pirotin gave her interview and provided a statement to Driver.

89.     On February 13, 2024, Griffin texted Ms. Pirotin seeking clarification if she intends to resign or if she would be returning to work on February 14, 2024.

90.     Ms. Pirotin responded to Griffin's text and informed him she was not feeling well. Ms. Pirotin stated she would be returning to work on February 19, 2024, as indicated on her doctor's note as provided.

91.     On February 15, 2024, Ms. Pirotin was terminated while on medical leave.

92.     Ms. Pirotin's health began to suffer due to the hostile and abusive work environment created by Griffin. During this time, she suffered from "stress induced lupus flare ups" and requested reassignment to an environment with reduced stress.

93.     Instead, Defendant's refusal to take necessary and proper corrective measures created emotional stress and anguish for Plaintiff. She was subjected to a hostile work environment that created emotional stress and anguish for her. Defendant and its agents knew or should have known such behavior by Griffin would worsen her condition.

### FIRST CLAIM FOR RELIEF
**(Disability Discrimination and Failure to Accommodate in Violation of Section 102(a) and (b)(5)(A) of the Americans with Disabilities Act ("ADA"), as amended, 42 U.S.C. § 12112(a) and (b)(5)(A))**

94.     Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

95.     Plaintiff is a member of the class of persons protected by state and federal statutes prohibiting discrimination based on her disability and/or request for accommodation.

96.     Plaintiff was qualified for her job and capable of performing the essential functions of her position with reasonable accommodations.

97.     Defendant was an employer subject to federal laws prohibiting discrimination under Title I of the Americans with Disabilities Act of 1990, as amended ("ADA"), and thus, has a legal obligation to provide Plaintiff with a work environment free from discrimination.

98.     Defendant and its agents refused to take reasonably adequate steps to prevent discrimination against Plaintiff by knowingly taking adverse employment

18

actions against Plaintiff because of her disability.

99.    Plaintiff is a "qualified individual with a disability which substantially limits a major life activity" as defined in Title I of the American with Disabilities Act.

100.   At all relevant times, Plaintiff had a qualifying disability within the meaning of the ADA: lupus.

101.   Defendant and its agents refused to offer Plaintiff the Environmental Coordinator position for which she was qualified nor was any other reassignment discussed.

102.   Defendant and its agents further discriminated against Plaintiff because of her disability by not making temporary, reasonable accommodation for Plaintiff. For example, Griffin became an interium supervisor when Crowell went out on medical leave. Plaintiff's doctor recommended "an environment that does not have the level of stress induced by her present supervisor" and suggested that she be moved to her associate supervisor.

103.   Since Defendant and its agents refused reassignment or to change her supervisor, Plaintiff reached out to the University Ombus Office for help in dealing with her toxic work environment. In response, Defendant and its agents allowed a meeting where Ombudsman Deyo noted some progress was being made but refused continued service because she initiated a charge with EEOC; although Defendant

and its agents clearly knew Plaintiff had previously reached out to EEOC back in April of 2023.

104.   Defendant and its agents discriminated against Plaintiff because of her disability by failing to engage in the interactive process calculated to develop a reasonable accommodation for Plaintiff, and instead imposed continued work in a stress induced environment against her doctor's orders, in lieu of providing Plaintiff with a reasonable accommodation that would have enabled her to return to work in a better circumstance to address Plaintiff's disability. Such reasonable accommodation would have permitted Plaintiff to perform the essential functions of her position and would not have created an undue hardship on Defendant.

105.   Defendant and its agents discriminated against Plaintiff because of her disability by subjecting her to less favorable terms, conditions, and privileges of employment, effectively forcing her to return to an unreasonable work environment, refusing to offer her the Environmental Coordinator position that she was qualified to perform, and terminating her employment because of her disability.

106.   The effect of Defendant and its agents' discriminatory practices have been to deprive Plaintiff of equal employment opportunities and otherwise adversely affect her status as an employee because of Plaintiff's disability, and/or Defendant and its agents' failure to reasonably accommodate Plaintiff's disability.

107. No other similarly situated person, not of Plaintiff's protected class were subject to the same or substantially similar conduct.

108. At all times material herein, the Defendant and its agents knew, or reasonably should have known, that the incidents, conducts, acts, and failures to act described herein above, would and did proximately cause Plaintiff to suffer emotional distress.

109. Defendant and its agents' above-described conduct was intentional.

110. Defendant and its agents' above-described conduct was done with malice or reckless indifference to Plaintiff's federally protected rights.

111. As a direct and proximate result of Defendant and its agents' above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and she is entitled to such general and special damages, economic damages, punitive damages, and attorney's fees and costs as permitted by law.

## SECOND CLAIM FOR RELIEF
### (Retaliation in Violation of the ADA, as amended, 42 U.S.C. § 12203(a))

112. Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

113. Defendant and its agents retaliated against Plaintiff after she made requests for reasonable accommodation related to her disability. For instance, Plaintiff requested the reasonable accommodation of leave from work to recover

from her stress induced lupus flare ups. In doing so, Plaintiff was engaging in activity protected under the ADA.

114. Plaintiff requested several accommodations, including approval for an anti-fatigue mat and to be considered for the Environmental Coordinator position. In doing so, Plaintiff was engaging in activity protected under the ADA.

115. In August of 2023, Plaintiff's doctor recommended "an environment that does not have the level of stress induced by her present supervisor" and suggested that she be moved to her associate supervisor. In doing so, Plaintiff was engaging in activity protected under the ADA.

116. In January of 2024, Plaintiff reached out to the Ombuds office for help with her stress induced work environment. In doing so, Plaintiff was engaging in activity protected under the ADA.

117. Finally, Defendant and its agents retaliated against her by ultimately terminating her employment while she was out on medical leave for her stress induced work environment.

118. There may be more detrimental acts of which Plaintiff is unaware which may also constitute retaliation in that it harmed Plaintiff.

119. Plaintiff suffered one or more adverse job consequences intentionally imposed by Defendant and its agents, including: forcing Plaintiff to continue working in a stress induced environment, refusing to offer Plaintiff one or more

position vacancies for which she was qualified; and terminating Plaintiff's employment. These consequences are of the type that would tend to discourage similarly situated employees from requesting or using accommodations related to a disability.

120. The Defendant and its agents are liable to the Plaintiff for wrongful termination in violation of Title I of the Americans with Disabilities Act of 1990, as amended ("ADA").

121. A causal connection exists between Plaintiff's protected activities and Defendant and its agents' materially adverse actions; i.e., Defendant and its agents forced Plaintiff to continue working in a stress induced environment, refused to offer Plaintiff one or more position vacancies for which she was qualified, and terminated Plaintiff because she requested and/or used reasonable accommodations related to her disabling medical condition.

122. Defendant and its agents' above-described conduct was intentional

123. Defendant and its agents' above-described conduct was done with malice and with reckless indifference to Plaintiff's federally protected rights.

124. As a direct and proximate result of Defendant and its agents' above-described actions, Plaintiff has suffered damages, including lost wages and benefits, emotional pain and suffering, embarrassment, and inconvenience; and she is entitled

to such general and special damages, economic damages, punitive damages and attorney's fees and costs as permitted by law.

**THIRD CLAIM FOR RELIEF**
**(Harassment and Hostile Work Environment)**
*Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.*

125. Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

126. At all times relevant, Plaintiff was an "employee" and Defendant was an "employer" within the meaning of Title VII.

127. Defendant is an employer within the meaning of 42 U.S.C. § 12111(5)(A), in that it has engaged in an industry that affects commerce and employs more than fifteen (15) employees.

128. Plaintiff is a "person claiming to be aggrieved...by [an] alleged employment practice" within the meaning of 42 U.S.C. § 2000e-5(f)(1).

129. At all times relevant, Plaintiff repeatedly endured unwelcome harassment on the basis of opposing sexual harassment and disability discrimination that was severe and pervasive, and that altered the conditions of her employment, and created an abusive atmosphere.

130. At all times relevant, Plaintiff repeatedly engaged in protected activity by opposing, complaining, and raising illegal and discriminatory and harassing practices.

131. Defendant and its agents knew about the hostile work environment against Plaintiff because she repeatedly complained to management, human resources, investigators, the University Ombuds Office, general counsel, and EEOC. Plaintiff also engaged in protected activity by participating in the Title IX investigation and filing multiple internal complaints.

132. Defendant and its agents failed to promptly address and remediate the harassment in question, resulting in retaliation against Plaintiff and creating an abusive work environment.

133. Defendant and its agents' discriminatory conduct was willful and intentional with reckless indifference to Plaintiff's federally protected rights.

134. Defendant and its agents violated Plaintiff's right to equal employment opportunity by allowing and failing to rectify a hostile work environment based on retaliation in violation of Title VII, which environment became increasingly caustic and harmful. All while causing Plaintiff ongoing emotional and psychological harm.

### FOURTH CLAIM FOR RELIEF
### Retaliation
*Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq.*

135. Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

136. At all times relevant, Plaintiff was an "employee" and Defendant was an "employer" within the meaning of Title VII.

137. Defendant is an employer within the meaning of 42 U.S.C. § 12111(5)(A), in that it has engaged in an industry that affects commerce and employs more than fifteen (15) employees.

138. Plaintiff is a "person claiming to be aggrieved...by [an] alleged employment practice" within the meaning of 42 U.S.C. § 2000e-5(f)(1).

139. At all times relevant, Plaintiff repeatedly engaged in protected activity by opposing, complaining, and raising illegal and discriminatory and harassing practices.

140. Defendant and its agents knew about the hostile work environment against Plaintiff because she repeatedly complained to management, human resources, investigators, the University Ombuds Office, general counsel, and EEOC. Plaintiff also engaged in protected activity by participating in the Title IX investigation and filing multiple internal complaints.

141. Title VII makes it unlawful for an employer to retaliate against an employee for opposing the employer's discriminatory practices or participating in any investigation or proceeding.

142. Defendant violated Plaintiff's right to equal employment opportunity by retaliating against Plaintiff by taking material adverse actions against her, damaging her professional career, and otherwise engaging in actions designed to dissuade her from making or supporting complaints and engaging in further

protected activity, all of which caused Plaintiff economic damages and ongoing emotional and psychological harm in violation of the anti-retaliation provisions of Title VII.

143.  The employment actions Plaintiff experienced in their totality and individually would have dissuaded a reasonable employee from reporting or opposing sexual harassment and disability discrimination.

144.  The retaliatory conduct Defendant and their agents directed at Plaintiff were based on her protected activity of opposing sexual harassment and disability discrimination.

145.  As a result of Defendant's discriminatory acts, Plaintiff has suffered and will continue to suffer pecuniary loss, mental anguish, pain and suffering, shame, humiliation, embarrassment, loss of enjoyment of life and other non-pecuniary loss.

146.  Defendant and its agents' retaliatory conduct was willful and intentional with reckless indifference to Plaintiff's state and federally protected rights.

**FIFTH CLAIM FOR RELIEF**
**(Retaliatory Harassment 42 U.S.C.A. § 2000e, *et seq.*)**

147.  Plaintiff incorporates by reference the above paragraphs as though set forth separately herein.

148.   By the acts and conduct complained of herein, Defendant and its agents has violated Title VII of the Civil Rights Act of 1964, as amended 1991, ("Title VII) 42 U.S.C.A. § 2000e, *et seq.*

149.   Plaintiff engaged in protected activities when she made requests for accommodation.

150.   Plaintiff suffered adverse employment actions when she was sexually harassed, to wit: when she was accused of unbuttoning her shit and having a short skirt, and when she was repeatedly accused of having sex with maintenance workers in her office.

151.   Defendant and its agents' conduct were so severe or pervasive that it created an environment that a reasonable person would find hostile or abusive.

152.   Defendant and its agents' conduct is imputable to Defendant, as Plaintiff's supervisor committed the harassment, and Defendant and its agents including HR knew about the harassment based on several complaints filed by the Plaintiff.

153.   As a proximate result of Defendant and its agents' wrongful conduct, Plaintiff has suffered severe emotional distress, anxiety, humiliation, and other compensatory damages, which Plaintiff seeks from Defendant.

154.   Defendant and its agents' actions were done maliciously, willfully or wantonly, or in a manner that demonstrates a reckless disregard for Plaintiff's rights.

As a result of Defendant and its agents' conduct, Plaintiff is entitled to recover punitive damages as allowed by law.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor against Defendant and order the following relief as allowed by law:

A.  Permanently enjoin the Defendant from engaging in said unlawful practices, policies, customs, and usages set forth herein and from continuing any and all other practices shown to be in violation of applicable law;

B.  Award Plaintiff compensatory damages, including but not limited to those for past and future pecuniary and non-pecuniary losses, emotional distress, pain, inconvenience, mental anguish and loss of enjoyment of life;

C.  Award Plaintiff punitive damages for all claims as allowed by law;

D.  All damages allowable by law, common law, statute, rule and regulation against Defendant;

E.  Pre-judgment, and post-judgment interest at the highest rate against Defendant;

F.  Reasonable Attorneys' fees and costs of the action against Defendant; and

G.  Grant such other equitable and monetary relief as the Court may deem just and proper.

## JURY TRIAL DEMAND

Plaintiff respectfully requests a trial by jury on all issues so triable.

Respectfully submitted this 4rd day of December, 2024.

**HKM Employment Attorneys LLP**

*/s/ Phavady Sunny Panyanouvong-Rubeck*
Phavady Sunny Panyanouvong-Rubeck

N.C. State Bar No.: 39966
3623 Latrobe Drive, Unit 122
Charlotte, North Carolina 28204
Tel. (980) 734-3851
Fax (980) 734-3851
spanyanouvong-rubeck@hkm.com

*Attorney for Plaintiff*

30